# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

SHERRY McDANIEL,

                 **Plaintiff,**

-vs-                                      **Case No.  6:05-cv-1467-Orl-DAB**

COMMISSIONER OF SOCIAL
SECURITY,

                 **Defendant.**

_____

## MEMORANDUM OPINION & ORDER

The Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying her claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under the Act.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case.  Oral argument has not been requested.

For the reasons that follow, the decision of the Commissioner is **REVERSED.**

## I. BACKGROUND

### A.      Procedural History

Plaintiff filed for a period of disability and DIB benefits on April 15, 2002.[1]  R. 68-70.  She

alleged an onset of disability on May 24, 2001, due a back injury at L3-4 and L4-5, hepatitis B, liver

damage, and bi-polar disorder.   R. 68, 144.   Her application was denied initially and upon

reconsideration.   R. 57-58, 61-62.   Plaintiff requested a hearing, which was held on November 9,

2004, before Administrative Law Judge Philemina M. Jones (hereinafter referred to as "ALJ").   R.

714-62.  In a decision dated May 19, 2004, the ALJ found Plaintiff not disabled as defined under the

Act through the date of her decision.  R. 7-20.  Plaintiff timely filed a Request for Review of the

ALJ's decision.   R. 6.  The Appeals Council denied Plaintiff's request on July 29, 2005.   R. 2-5.

Plaintiff filed this action for judicial review on October 3, 2005.  Doc. No. 1.

### B.      Medical History and Findings Summary

Plaintiff was 39 years old at the time of the ALJ's decision; she has a high school education

and past relevant work as a cleaner, aircraft utility worker, sales clerk, and cashier R. 10, 68, 114, 722-

23.  Plaintiff was employed as a fleet service clerk for American Airlines from 1987 through 2001.

R. 117-18, 181-82.

Plaintiff's medical history is set forth in detail in the ALJ's decision.   By way of summary,

Plaintiff complained of a back injury, hepatitis B, liver damage, and bi-polar disorder.  R. 68, 144.

After reviewing Plaintiff's medical records and Plaintiff's testimony, the ALJ found that Plaintiff

suffered from hepatitis B, back pain, depression, and an affective disorder, which were "severe"

---

[1]Plaintiff applied for benefits on September 5, 2001, which was denied on December 27, 2001, and Plaintiff did not appeal.  R. 51, 64-66.  As a consequence of the separate proceedings, the Commissioner did not prepare a Table of Contents for the Exhibits of the earlier matter, leaving the Court to sift through *630 pages*.  The Commissioner should take greater care in preparation of the record.

medically determinable impairments but not impairments severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  R. 15.  The ALJ determined that Plaintiff retained the residual functional capacity (RFC) to perform sedentary work, with no more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling; and should avoid concentrated exposure to hazards; and limited to simple and routine instructions, with mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence and pace.  R. 16-17; 19, Finding 6.  In making this determination, the ALJ found that Plaintiff's allegations regarding her limitations were out of proportion and inconsistent with the medical evidence and were not fully credible.  R. 15.  Based upon Plaintiff's RFC, the ALJ determined that she could perform past relevant work as a cashier; however, because the work was possibly performed more than 15 years ago, the ALJ proceeded as if the claimant could not perform any of her past relevant work.  R. 17.  Based on the testimony of the vocational expert ("VE"), the ALJ concluded that Plaintiff could perform other work existing in significant numbers in the national economy.  R. 18-20, Finding 12.  Accordingly, the ALJ determined that Plaintiff was not under a disability, as defined in the Act, at any time through the date of the decision.  R. 18, 20, Finding 13.

Plaintiff now asserts four points of error.  First, she argues that the ALJ erred by finding she had the RFC to perform sedentary work contrary to the opinions of her treating physician and psychiatrist.  Second, she alleges that the ALJ should not have relied on the Vocational Experts testimony after posing an improper hypothetical.  Third, she asserts that the ALJ erred by improperly applying the pain standard.  Fourth, she argues that the ALJ erred in evaluating her credibility.  Because the ALJ did not properly credit the opinions of the treating physicians and failed to properly assess Plaintiff's credibility as discussed below, the decision of the Commissioner is **REVERSED**.

## II.  STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – *i.e.,* the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson*, 402 U.S. at 401).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004).  "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" *Id.* (internal quotation and citation omitted); *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

### A.     RFC and the treating physicians' opinions.

Plaintiff claims that the ALJ should not have found her able to perform sedentary work in light of the limitations assigned by her orthopedist, Dr. Greenberg, and her psychiatrist Dr. Gifford, precluding the performance of sedentary work.  Plaintiff contends that the ALJ erred in determining

that Plaintiff has the residual functional capacity to perform sedentary work when the claimant's treating physician indicated that she would be unable to perform sedentary work, and the treating psychiatrist concluded that the claimant had significant mental limitations precluding employment.

Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite her impairments.  20 C.F.R. § 404.1545(a); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).  The focus of this assessment is on the doctor's evaluation of the claimant's condition and the medical consequences thereof.  *Id.*  Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See Lewis*, 125 F.3d at 1440; *Edwards*, 937 F.2d at 583; 20 C.F.R. §§ 404.1527(d), 416.927(d).

If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

The ALJ found that Plaintiff retained the RFC to perform sedentary work, she can lift/carry up to ten pounds maximum and can occasionally climb, balance, stoop, kneel, crouch and crawl but had to avoid hazards.  R. 16.  The ALJ found, in effect, that the Plaintiff was not capable of performing her past relevant work as a cashier because it was potentially performed beyond the fifteen

year window.  R. 17.  The ALJ determined based on the VE's testimony, that Plaintiff could perform the position of cashier as other work in the economy.

Plaintiff contends that the ALJ failed to adequately support her rejection of the opinion of Plaintiff's treating orthopedist Dr. Jonathan Greenberg.  The ALJ rejected the opinion of Dr. Greenberg, the treating physician, and stated his opinion "will not be given most weight because it is not fully supported by the objective evidence."  R. 16.  Dr. Greenberg began treating Plaintiff for her back condition beginning on April 4, 2001 and opined that Plaintiff should be at "light duty status only with less than ten pounds of lifting."  R. 209-10.  After three years of treating Plaintiff, Dr. Greenberg, on July 19, 2004, indicated that Plaintiff could sit and stand for less than one hour per day, lift ten pounds occasionally, could not use her feet/legs for repetitive work, and would require complete freedom to rest throughout the day.  R. 711-12.

As Plaintiff appropriately points out, the ALJ's only other reference to the opinion of Dr. Greenberg was: "As discussed above, Dr. Greenberg's opinion is not supported by the record."  R. 16.

The ALJ failed to specifically refer to Dr. Greenberg's opinion "above" or elsewhere in the opinion, and it appears that a section of the ALJ's opinion may have been omitted or garbled.  It reads:

> On November 8, 2004, Dr. Greenberg completed a Physical Capacities Evaluation assessment where he opined that the claimant could sit and stand less than 1 hour.  She could lift a maximum of 10 pounds occasionally.  She could not use her legs and feet for repetitive work and she required complete freedom to rest frequently and without restrictions.  She would need to lie down and rest for substantial periods of time during the day to avoid increased symptoms at work and her limitations have been present since at least May 24, 2001.  *The undersigned accords these opinions little weight as the State physicians' opinions are too optimistic and have not taken into consideration the claimant's back pain*. . . . This is based upon an assessment of all of the residual functional capacity statements and the medical records, giving the claimant all benefit of the doubt.

R. 16 (emphasis added).  In the same sentence the ALJ moves from discussing Dr. Greenberg's opinions into rejecting the State physicians' opinions, without explanation as to why Dr. Greenberg's opinion is rejected.  Logically, the sentence (italicized above) makes no sense.  The ALJ's finding is also unreasonable because the objective evidence, and the consultative examiner's report, support Dr. Greenberg's opinion.

The Commissioner contends that Plaintiff's back pain was not disabling because she went back to work and, "Nothing in the record shows that Plaintiff's condition has deteriorated since May 2001."  This argument ignores the objective evidence from Dr. Goll, Plaintiff's orthopedic surgeon, which very clearly demonstrates that she reinjured her shoulder and upper back/neck in April 2001, her alleged onset date, and eventually could not work for American Airlines any longer because of the light duty restrictions.  R. 68.  Objective testing ordered by Dr. Greenberg further supports Plaintiff's impaired back condition and pain.   Once Plaintiff stopped working she sank into a depression which markedly limited her concentration and attention.

Plaintiff worked for American Airlines for fifteen years, most recently as a baggage handler, lifting up to 75 pounds.  R. 145, 324.  On May 21, 1998, she injured herself while unloading an aircraft. R. 343.  A July 1998 MRI showed marked disc dehydration and degeneration changes at L4-5 and mild dehydration changes at L3-4.  There was also an eccentric disc bulge, L4-5 to the left with angular tear, well visualized on axial views.  R. 339.  Following months of treatment with non-surgical options, Plaintiff underwent a lumbar discectomy and interbody fusion at L3-4 and L4-5 with BAK threaded titanium cages and a bone graft in January 1999 R. 335.  Plaintiff remained off work for about one year and continued in physical therapy.  R. 326.  She was progressing extremely well

at work hardening until she strained her back on the rowing machine when the seat collapsed on January 20, 2000; the started having persistent back pain with spasm.  R. 325.

By March 2000 she had successfully completed the work hardening program and qualified for work in the heavy category lifting up to 100 pounds occasionally and 75 pounds frequently. R. 324. She was allowed to return to work regular duty without restrictions; Dr. Goll assessed a 13% permanent partial impairment. R. 323.  Unfortunately, less than two months later, on April 27, 2000, as she was working at American Airlines unloading a plane, a co-worker dropped a bag weighing approximately 100 pounds and Plaintiff tried to catch the bag. R. 323.  She immediately felt neck and upper back pain and left arm pain.  R. 323.  The physical examination of her left shoulder revealed negative drop arm; a positive impingement, and full range of motion at the extreme with pain.  R. 320. She also had pain with palpation of the proximal deltoid and the biceps tendon.  R. 320.  She was placed on light duty with sedentary work restrictions.  R. 319.  By September 2000, her shoulder and neck pain had resolved and Dr. Goll released her to regular duty without restrictions and 0% partial impairment due to the April 2000 dropped-bag incident.  R. 316-17.

One month later, in October 2000, Plaintiff returned to Dr. Goll for reevaluation.  R. 316.  She had been working full time regular duty as a flight service attendant where her duties included stripping down and cleaning the aircraft on the ramp between 9:00 pm. and 5:30 a.m., which involves a lot more twisting than her previous duties such as loading bags. R. 316.  "She has persisted in doing the best she can but on Thursday her pain became such that she felt she needed to take a sick day." R. 316.  She was instructed to return to Dr. Goll for evaluation and he let her continue on regular duty without restrictions.  R. 316.  Plaintiff visited the emergency room and returned to Dr. Goll in

February 2001 when she exacerbated her back pain.  R. 315.  He prescribed that she remain off work for a few days, then return to regular duty without restrictions.  R. 314.

By April 2001, when Plaintiff returned to Dr. Goll for follow up of her lower back pain, he remarked: "She has been making a gallant attempt to continue to work in a regular unrestricted capacity but the required lifting of heavy pieces of luggage and the continual crawling in the bins of the airplanes as she is doing so, continues to aggravate her pain.  R. 313.  She rated her pain as moderate to severe and she had an exacerbation with increased pain on March 26, 2001.  R. 313.  Dr. Goll placed plaintiff on permanent light work restrictions with no lifting greater than 20-25 pounds and no repetitive bending.  R. 313.  In May 2001, he noted that she had reached maximum medical improvement and that these restrictions remained effective and were permanent.  R. 311.  Dr. Goll, at Plaintiff's May 2001 visit, noted Plaintiff's depression:

> The patient returns for follow-up.  She is here today to talk about her depression.  She saw Doctor Greenberg and he is recommending some kind of surgery.  She does not want to have it.  She has lost a significant amount of money since she was placed on light duty restrictions because they have terminated her.  She is tearful.  She is not eating.  She complains of loss of appetite.  She notes depression. . . . Because of the circumstances the patient finds herself in at this time, she has developed a reactive situational depression.  She would benefit from psychological counseling to help her work through her feelings of depression.  Psychiatric or psychological referral is medically necessary related to her workers' compensation situation.

R. 311.  During the initial examination of Plaintiff on April 2001, Dr. Greenberg[2] noted that her lumbar spine demonstrated direct tenderness on the left side at L4, L5, S1 and the left sacroiliac region as well as the left sciatic notch region, straight leg raising on the left side produced pain, there was a limited range of motion in the lumbar spine, sensory examination demonstrated decreased

---

[2]The medical records show that Dr. Goll was selected through Plaintiff's workers compensation carrier; Dr. Greenberg was recommended by Plaintiff's then-attorney for workers compensation.

sensation over the left L4, L5 and S1 dermatomes, and her gait was left antalgic for heel, toe and regular walking.  R. 209.  At all subsequent visits with Dr. Greenberg, he noted that the examination performed revealed no significant changes from the prior examinations.  R. 374, 376, 689-692. Additionally, Dr. Greenberg referred Plaintiff for a lumbar myelogram and lumbar CT scan, which in June 2002 revealed a lucency at L4-5 adjacent to the lateral aspect of the right interbody fusion cage suggestive of incomplete union.  R. 373.

The ALJ does discuss (until afterwards) the report of the consulting examiner, Dr. Haté, who findings actually support rather than refute Dr. Greenberg's.  Dr. Haté found Plaintiff had symptoms of pain on toe and heel walking, antalgic gait, discomfort on the examination table, 50% squatting, and reduced range of motion in the spine, consistent with the discectomy and fusion grafts.  R. 16; 499.  In addition, although not cited by the ALJ, Dr. Haté commented in his exam report that at L4-5, there was a lucency seen adjacent to the lateral aspect of the right interbody fusion cage suggestive of incomplete union which could be causing her pain.  R. 499.  He also noted that medical records were consistent with the diagnosis of hepatitis.[3]  R. 499.

Dr. Greenberg referred Plaintiff to Dr. Oh's Pain Clinic to explore the possibility of placement of an intrathecal morphine pump.  R. 674.  Plaintiff responded well to the trials, but unfortunately for Plaintiff, her roommate overdosed on the medications Dr. Oh prescribed and she was discharged as a patient in March 2003.  R. 674.  Dr. Greenberg then referred her in June 2003 to Dr. Rajyaguru's Advanced Pain Clinic because he believed Plaintiff to be a good candidate for pump placement.  R. 685, 688.  However, Dr. Rajyaguru did not take Medicaid, so Plaintiff could not be treated there.  R.

---

[3]Although Dr. Haté opined that Plaintiff's Hepatitis B infection was asymtomatic, other records indicate that it is "active."  R. 381, 604.

689.  Dr. Greenberg remained willing to implant the pump if Plaintiff could find a physician responsible for long term management of the pump and refills.  R. 689.  She could not afford the pump. R. 701.  She experienced seizures withdrawing from controlled substances in May 2002 and January 2003.  R.417, 701.  The pain medications she takes, prescribed by Dr. Feiner treating her for her liver problems, dull the pain but do not get rid of it.  R. 727-28.  Plaintiff's visits to Dr. Greenberg were sporadic because she had no health insurance and could not afford it.  R. 724.  By November 2004, in a Physical Capacity Evaluation, Dr. Greenberg opined that Plaintiff could sit or stand less than one hour, lift up to ten pounds occasionally, but required the complete freedom to rest frequently and without restriction.  R. 712.

Based on the decision as written, the ALJ's rejection of Dr. Greenberg's opinion is not supported by substantial evidence.  If nothing else, the ALJ did not even finish a logical sentence of why she was rejecting Dr. Greenberg's opinion  and she certainly did not adequately discount his opinion based on his thorough examinations of Plaintiff and a review of the objective testing, the myelogram and CT scan that Dr. Greenberg ordered, which Dr. Haté's consulting examination supported in this case.

Plaintiff began treatment with Dr. Jeanne Gifford for depression from January 2000 to June 23, 2003[4].  R 346, 688.  In January 2000, Dr. Gifford opined that Plaintiff's depression was "in good control."  R. 347.  In June 2001 – two months after she stopped working because she was restricted to light duty and none was available – Dr. Gifford explained:

> [Plaintiff] has been coming to see me on a regular basis.  She has done fairly well for a time re the depression/hepatitis.  Her back has given difficulty on occasion.  She has stayed home or gone to see the Orthopedic doctors for advice and treatment and has

_____

[4]Plaintiff would have seen Dr. Gifford more but could not afford to pay for the treatment.  R. 688.

-11-

been able to continue functioning. [Plaintiff] continued to work however and her own depression/anxiety remained stabilized. Then at some point she was told she could no longer work in the Orlando Airport because of weight limitations in the jobs which were available.  She was not laid off so could not get unemployment.  She had some restriction on other available funds.  As the situation became more and more untenable financially, she became more stressed.  At times she reported passive suicidal ideation but it was not present at time of appointment. . . . Technically the Depression and Anxiety were as much in control as possible considering the circumstances.

R. 347.

In June 2002, Dr. Gifford completed a Mental Residual Functional Capacity Assessment in which she opined that Plaintiff was moderately limited in various areas of understanding and memory, sustained concentration and persistence, and adaptation, and markedly limited in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  R. 378-79.  She opined:

Plaintiff has the ability to carry out basic tasks of living.  From a mental health standpoint she can handle direction, supervision, dealing with others and could learn new tasks.  She cannot however sustain a calm receptive attentive manner for more than an hour or two.  She has problems with attention, focusing, anxiety.  These are complicated by her difficulty coping with weakness and pain.  Before her physical limitations progressed she was able to compensate, but still had difficulty with concentration and focus.

R. 380.

On July 21, 2002, Dr. Gifford noted that "because of her liver condition[5] she has been advised against the more readily available pain medications and antidepressant medication and therefore is under great stress at all times. . . . She has a slight tremor much of the time. . . . Due to her anxiety and

---

[5]In summer 2002, Plaintiff's most recent laboratory investigations still showed that she remained viremic in spite of the use of lamivudine, suggesting that she has had a breakthrough mutation while on the therapy and still had hepatitis B surface antigen positive.  R. 381.  Dr. Feiner opined her chronic active hepatitis B remained despite treatment, which "can have a debilitating course depending on the activity of histolgic disease and involvement."  R. 604 (June 2002).

depression she has difficulty concentrating and maintaining rapport with customers or fellow workers. In my opinion she should not be employed at this time." R. 346. In August 2002, Dr. Gifford provided a detailed report in response to a request from SSA diagnosing Plaintiff with Major Depressive Disorder and opining that Plaintiff's concentration was poor at times, worse when worried or agitated regarding money or with crowds. R. 345. Dr. Gifford indicated that Plaintiff was unable to work due to her depression on August 4, 2002 and that Plaintiff's "prognosis is guarded because of the difficulty treating depression with medication restrictions due to other problems, *i.e.*, back/disc impairment with pain and liver disease progression." R. 344-45.

Dr. Austin, one of the consulting psychologists, reported on September 17, 2002, that Plaintiff had a longstanding history of counseling as a young adult for depression. R. 394. She was hospitalized in 1990 for suicidal ideation, and was diagnosed with bipolar disorder. R. 394. She reported feeling at the time of the consultation as if her life had been taken away. R. 394. Since she was not able to work, she was experiencing crying spells, depressed mood, suicidal ideation, and feelings of hopelessness and helplessness. R. 395. Dr. Austin indicated that Plaintiff's mood was depressed and her affect was blunted and Plaintiff's "overall functional ability is limited at this time" and "[h]er prognosis is guarded because of the difficulty treating depression with medication restrictions due to other problems such as back/disc impairment with pain and liver disease progression." R. 395. A reviewing psychologist, Dr. Bartlett, opined in October 2002 that Plaintiff's depression symptoms have significantly increased for suicidal ideation and amplified some of these depression symptoms to the point of affecting her concentration, attention span, and pace of daily activities (although he found it to be "moderate"). R. 507, 511.

On February 20, 2003, Plaintiff tried to commit suicide when she took an overdose of her medications and she was Baker Acted.  R. 548, 569, 731.  She reported having been previously admitted in 1995 and 1999 in Nashville, Tennessee.  R. 552, 701, 705.  Her GAF at the time was 40. R. 548.  During the April 2003 consultative examination by Dr. Fleischmann, Ph.D., Plaintiff reported that her daughter was removed from her custody because she was not able to buy food or clothes for her.  R. 568.  Plaintiff reported being depressed since her back injury and that it just "keeps getting worse."  R. 569.  Her symptoms were daily crying, isolation, insomnia, amotivation, and anhedonia. R. 569.  She also suffered from anorexia/bulimia.  R. 569.

Dr. Gifford completed a Medical Assessment of Ability to Do Work Related Activities-Mental on July 15, 2003.  Dr. Gifford opined that Plaintiff had a poor ability to deal with work stresses and maintain attention/concentration; and only a fair ability to use judgment or function independently. R. 662.  In support, Dr. Gifford cited Plaintiff's inability to complete the school classes begun by her Vocational Rehabilitation counselor – due to poor concentration – becomes very anxious (shakes more) when in situations of stress whether medical or work related.  R. 663, 720 (Plaintiff's testimony that she had a nervous breakdown).  She cited that Plaintiff, at times, has used poor judgment regarding her choice of friends and of behavior.  R. 663, 664.  Plaintiff had gotten herself into some dangerous situations with friends, boyfriends, including having her medications stolen.  R. 664. Medical records support two examples of poor judgment – Plaintiff's choice of boyfriend who assaulted her on June 26, 2001 almost breaking her nose (R. 460-70) and her choice of roommate who stole Plaintiff's medications leading to an overdose in March 2003. R. 674. Dr. Gifford also described Plaintiff's ability to understand, remember and carry out complex job instructions as fair and in support explained that with regard to Plaintiff's memory problems, she had had difficulty carrying

out the needed requirements for filing for disability and arranging for her medical care etc.; she comprehends but loses concentration and fails to carry out.  R. 663.  Overall, Dr. Gifford opined that Plaintiff's "severe anxiety and poor memory – possibly at least in part due to pain and medical deterioration – cause difficulty in dealing with people – coworkers, supervisors, and in learning complicated tasks."   In Dr. Gifford's contemporaneous Mental Residual Functional Capacity Assessment, she opined that Plaintiff is moderately to markedly limited in her ability to maintain attention and concentration for extended periods, as well as moderately limited in six other categories. R. 665-66.  Dr. Gifford's explained her opinion:

> While [Plaintiff] can handle some aspects of day to day living and meeting [the] public and making plans, she has such severe anxiety, memory and concentration problems that her functioning in the workplace would be sporadic.  She has often forgotten appointments with me but was recently easily able to get here on the public bus.
> Her pain from back and from liver disease is nearly constant and is a large factor in distracting her.  Because of the liver disease medication choice is limited.  It is therefore difficult to achieve mental health stabilization.

R. 667.

One of the reviewing psychologists, Dr. Cox, recognized that Plaintiff had suffered "one or two" episodes of decompensation, each of extended duration.  R. 574.  It is most likely that Plaintiff has suffered three episodes of decompensation – a degree of limitation that satisfies the functional criterion – based on her consistent accounts of two hospitalization in Tennessee in the 1990s prior to the February 2003 suicide attempt. R. 394, 552, 701.

Once Plaintiff could no longer afford treatment with Dr. Gifford, she sought treatment at Lakeside Alternatives.  She was again diagnosed with bipolar disorder depressed and assigned GAF scores of 41 and 45 in July and October 2003.  R. 702, 709.  Although the health care professionals

treated her until August 2004 the only other GAFs score for November and December were 50 and 65 even though "no change" was noted to Plaintiff's condition.  R. 698-99.

Despite the extensive mental health records, including those from the suicide attempt in February 2003, the ALJ found that Dr. Gifford's opinion was not supported by the subjective evidence and Plaintiff had "**no** repeated episodes of decompensation."  R. 17.  The ALJ's rejection of Dr. Gifford's opinion was not based on substantial evidence.  The ALJ failed to address Plaintiff's suicide attempt and deteriorating mental condition and held there were "no" episodes of decompensation despite extensive records of Plaintiff's 2003 suicide[6] attempt, being Baker Acted, her testimony, and consistent references to earlier mental health hospitalizations in the records.

These serious mistakes in the ALJ's decision are not adequately addressed in the Commissioner's response and mandate remand.   In addition, there were such extensive medical and psychological records to support the treating physicians' opinions, which the consultative examinations supported, and to some degree – on the decompensation issues – even the reviewing physicians supported.

### B.    Pain and credibility.

Plaintiff asserts that the ALJ erred in evaluating her pain and by finding her subjective complaints credible only to the extent she is limited to sedentary work.  She contends that the record demonstrates her credibility regarding her limitations and the ALJ failed to provide adequate and specific reasons for discrediting her complaints.

---

[6]Although Plaintiff maintained at the time of admission that she had not attempted suicide, she testified at the hearing and admitted to mental health practitioners, that it was a suicide attempt.  R. 731, 707.  She admitted at the time that she overdosed after a fight with her daughter who was threatening to run away.

Pain is a non-exertional impairment. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote*, 67 F.3d at 1560 (quoting *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)). Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423(d)(5)(A).

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. *Foote*, 67 F.3d at 1561-62; *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

The ALJ did not refer to the Eleventh Circuit's pain standard but she applied the governing SSA standards for evaluating subjective complaints and she cited the applicable regulations and Social

Security Ruling ("SSR") 96-7p.  R. 15.  However, the ALJ's credibility determination of Plaintiff's subjective complaints was not based on substantial evidence.

In discussing Plaintiff's RFC, the ALJ stated:

> The claimant's subjective complaints and symptoms, including her allegations of depression and limitations have been given a great deal of thought and carefully compared to the other evidence.  The claimant's testimony and other reports reflect that she lives a light type lifestyle, which is consistent with the medical evidence.  The claimant alleges hepatitis, however, she underwent treatment with interferon and later Lamivudine with normalization of liver function tests.  Her last biopsy was normal.  She underwent lumbar fusion for her back pain and diagnostic testing revealed solid fusion of the lumbar spine and she was released to regular duty without restrictions.  She continues her mental health treatment at Lakeside Alternatives and she has been able to work successfully for many years while undergoing mental health treatment and while she is compliant with her medication.  She is able to take care of her personal needs and activities of daily living.  There are no reported side effects from any medication.  Activities and reports such as these are inconsistent with her allegations of incapacitating limitations or depression.  This is not to minimize the medical impairment demonstrated in the record.  The claimant does have impairments that limit her activities such as heavy lifting and she does have some deficits with maintaining concentration.  However, the clinical findings resulting from these impairments do not appear to be of a degree capable of producing limitations of incapacitating proportion.  Accordingly, the undersigned finds that the claimant's allegations and subjective symptoms are out of proportion and inconsistent with the medical evidence and are not fully credible.

R. 15.

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Jones v. Dep't of Health and Human Servs.*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *Foote*, 67 F.3d at 1561-62; *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

In this case, Plaintiff had pain and mental limitations caused or exacerbated by a severe back impairment.  As explained above, the ALJ's misstates the status of Plaintiff's lumbar fusion and relies on outdated diagnostic testing that revealed solid fusion of the lumbar spine as of 2001.  Plaintiff was released to regular duty without restrictions for a short period until, according to Dr. Goll, her workers compensation treating orthopedist, she injured her neck, upper back and left arm (R. 323) and after recovering from that injury, and despite her "gallant attempts" to continue working at the heavy exertional level, she could only perform light duty and she was terminated.  R. 311.  Two other physicians, Dr. Greenberg and the consulting examiner Dr. Haté opined based on the objective medical evidence that her pain was caused by a lucency at L4-5.  Plaintiff was unable to take the appropriate steps to reduce the pain as prescribed by Dr. Greenberg – insertion of a morphine pump – due to lack of funds and inability to find a pain management doctor who would accept Medicaid.

Although Plaintiff does not contest the ALJ's general findings on Plaintiff's hepatitis, the ALJ's rejection of Plaintiff's complaints of pain and fatigue from her Hepatitis B is part of the credibility determination and is not supported by substantial evidence.  While it is true that some of Plaintiff's liver tests were normal, her treating specialist at Shands Healthcare opined in July 2002, that "Her most recent laboratory investigations still showed that she remained viremic in spite of the use of lamivudine, suggesting that she has had a breakthrough mutation while on the therapy. . . .  Her most recent hepatitis B markers confirm that she is still hepatitis B surface antigen positive. . . . Her hepatitis B antigen is positive and her HBV DNA remains positive."  R. 381.  The other physician treating her for Hepatitis, Dr. Feiner stated that "[d]espite treatment, she remains with chronic active hepatitis B which can have a debilitating course depending on the activity of histolgic disease and involvement."  R. 604 (June 2002).  Moreover, for the ALJ to say  finding "[t]here are no reported

side effects from any medication" fails to credit any of Plaintiff's testimony regarding serious side effects from the *chemotherapy* she received for Hepatitis B, which made her hair fall out in clumps and made her fatigued and caused joint pain; these are widely-acknowledged side effects of chemotherapy.  R. 15; 731, 734.

The ALJ also incorrectly summed up Plaintiff's mental health history as "being able to work successfully for many years while undergoing mental health treatment and while she is compliant with her medication."  R. 15.  First, Plaintiff received inpatient mental health treatment for at least one other suicide attempt in the 1990s, presumably during the time she worked for American Airlines from 1987 to 2001.  Second, Dr. Gifford and the consulting examiner, Dr. Austin, both note that Plaintiff is unable to take the appropriate medication for stabilizing her mental health because of the condition of her liver.  R. 344-46, 395.

Also troubling in the ALJ's decision is the ALJ's inexplicable and incorrect statement that Plaintiff claimed to have "AIDS and takes medication for it which is not supported by the record."  R. 12.  Nowhere in the record did Plaintiff make the claim that she had AIDS – rather, at the hearing she described the chemotherapy she was taking as Hepsera, a drug that is prescribed to AIDS patients.  R. 728.  The Court finds the ALJ's comments about Plaintiff "speaking loudly in the elevator" when they rode up together on the way to the hearing also to be mystifying and portentous of a decision made on criteria other than that in the record.  R.  720.  The ALJ's finding on Plaintiff's non-exertional limitations and her credibility are not supported by substantial evidence.

## IV.  CONCLUSION

For the reasons set forth above, the ALJ's decision is not supported by substantial evidence. When the VE was presented with hypotheticals applying the exertional and non-exertional limitations

as outlined by Dr. Greenberg and, separately, by Dr. Gifford, the vocational expert indicated that Plaintiff could not work. R. 751-52, 759-60.   Accordingly, the Court **REVERSES** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g) and **REMANDS** it to the Commissioner for an award of benefits.  The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

      **DONE** and **ORDERED** in Orlando, Florida on March 13, 2007.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record

-21-